# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 09cr577-MMA-1 |
|---|---|
| Plaintiff, | |
| vs. | **ORDER RE: DEFENDANT'S MOTION TO SUPPRESS STATEMENTS** |
| | [Doc. No. 100] |
| JESUS NAVARRO-MONTES (01), | |
| Defendant. | |

On October 28, 2010, Defendant Jesus Navarro-Montes ("Navarro-Montes") was arraigned under a third superseding indictment and charged as follows: (1) on January 19, 2008, conspiracy to distribute 100 kilos or more of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846; (2) on September 23, 2007, possession with intent to distribute 445.32 kilos of marijuana in violation of 21 U.S.C. § 841(a)(1); and (3) on January 19, 2008, killing, with malice aforethought, United States Border Patrol Agent L. Aguilar in Imperial Sand Dunes Recreation Area by striking him with a Hummer vehicle in violation of 18 U.S.C. § 1114.

The matter is currently before the Court on Navarro-Montes' Motion to Suppress Statements. On December 6, 2010, the Court held an initial hearing on the motion. On January 11, 2011, the Court held an evidentiary hearing to consider the voluntariness of certain statements made by

Navarro-Montes to Mexican authorities. Having considered the submissions of the parties, oral arguments of counsel, and testimony of the witnesses, the Court denies the motion to suppress these statements.

## DISCUSSION

*1. Summary*

Navarro-Montes moves to suppress statements he made to Mexican authorities on three separate occasions in January 2008 and February 2009. He argues that these statements are inadmissible either because he was not given his *Miranda* warnings, or he made the statements involuntarily, or both. Navarro-Montes, a non-citizen, claims entitlement to Fifth Amendment rights under the United States Constitution because the United States and Mexico were involved in a "joint venture" to investigate and detain him in relation to this case, thereby extending constitutional protection to him.

In addition to the oral arguments of counsel and their written submissions, the parties had the opportunity during an evidentiary hearing to present witness testimony and exhibits in support of their respective positions concerning the voluntariness of Navarro-Montes' statements. The government called four witnesses and submitted a number of exhibits. Navarro-Montes did not call any witnesses, however, he cross-examined the government's witnesses, submitted exhibits, and testified on his own behalf. A summary of the pertinent portions of each witness' testimony is summarized below.

a) Mario Alberto Diaz-Alcantar

In January 2008, Mario Alberto Diaz-Alcantar held the position of Investigative Prosecutor II with the State Attorney General's Office, State of Sonora, Mexico. Diaz-Alcantar testified on direct examination that on January 22, 2008, he was on duty and presented with an Information by Sonoran police charging Navarro-Montes with bribery. The police brought Navarro-Montes to Diaz-Alcantar's office, at which time he provided Navarro-Montes with the opportunity to make a ministerial declaration, a transcribed and witnessed oral declaration. A public defender was assigned to represent Navarro-Montes and was present during his declaration to the prosecutor. After giving his statement, Navarro-Montes and his attorney read the transcription to make sure it

1   accurately reflected his declaration and then signed it.

2   Diaz-Alcantar testified that Navarro-Montes was not beaten or otherwise abused or threatened in his office, nor did Navarro-Montes allege that he had been abused or threatened. Navarro-Montes was very calm. The public defender assigned to represent Navarro-Montes never mentioned that Navarro-Montes had complained of beatings or abuse, even though there were opportunities to memorialize such allegations. After his declaration, two doctors examined Navarro-Montes and found no evidence of injury. Diaz-Alcantar stated that he decided not to pursue the state bribery charges due to insufficient evidence, and that he was not aware at the time that a warrant had been issued for Navarro-Montes' arrest for federal crimes.

10   On cross examination, Diaz-Alcantar testified that Navarro-Montes was provided notice of his rights under Mexican law, including the right to declare or decline to declare the facts of which he was accused. According to Diaz-Alcantar, Navarro-Montes was not provided notice of any rights under U.S. law because any statement elicited was pursuant to questioning regarding the Mexican state crime of bribery. Subsequent to being advised of the bribery allegations, Navarro-Montes was given several minutes to confer with his public defender. Navarro-Montes informed Diaz-Alcantar that he had bribed the police not to detain him due to the problems he was having with U.S. officials. Diaz-Alcantar testified that Navarro-Montes' declaration was almost entirely related to the events in the U.S. because they were the antecedent events to the bribery allegations. Diaz-Alcantar reiterated that a medical doctor examined Navarro-Montes after he was detained, although Diaz-Alcantar did not examine Navarro-Montes personally. According to Diaz-Alcantar, after Navarro-Montes left his office on January 22, 2008, he did not have any contact with him again.

22   b)   <u>Jesus Omar Castlo-Ramos</u>

23   On January 22, 2008, Jesus Omar Castlo-Ramos, a public defender, represented Navarro-Montes during his ministerial declaration before the prosecutor regarding the state bribery charges. Castlo-Ramos testified that he reviewed the Information charging Navarro-Montes prior to sitting in on the declaration, and had the opportunity to speak with Navarro-Montes and advise him regarding his right to decline making a declaration. Castlo-Ramos stated that he was present during Navarro-Montes' declaration, and reviewed the transcript of the declaration and found it to be accurate.

1  Castlo-Ramos recalled observing no indications that Navarro-Montes had been physically assaulted,
2  and stated that if he had observed any signs of assault he would made a statement to that effect at the
3  close of the declaration.

4  On cross examination, Castlo-Ramos admitted that he remembered only a little of what
5  happened on January 22, 2008. On rebuttal, Castlo-Ramos testified that Navarro-Montes never told
6  him that he had been beaten or threatened by anyone prior to making his declaration.

7        c)     <u>Cesar Manuel Adame Munoz</u>

8  On January 23, 2008, Cesar Manuel Adame Munoz was the federal prosecutor on duty in
9  Mexicali. He testified that he received notice on January 22, 2008 that there was an individual who
10 had been arrested and who had stated he killed a border patrol agent. Munoz testified that at the
11 time, their office had an active investigation concerning the death of a border patrol agent with the
12 last name of Aguilar. According to Munoz, there was also a federal arrest warrant out for Navarro-
13 Montes for human trafficking (unrelated to the death of Agent Aguilar).

14 Munoz testified that he was present when Navarro-Montes arrived at the federal prosecutor's
15 office in Mexicali, and Navarro-Montes was provided an attorney prior to making a declaration.
16 According to Munoz, Navarro-Montes was advised of his federal Mexican rights, including the right
17 to remain silent. A secretary recorded the declaration, which Navarro-Montes and his attorney
18 reviewed and found to be accurate. Munoz testified that during his declaration, Navarro-Montes
19 was calm while describing the events surrounding Agent Aguilar's death. At the end of the
20 declaration, Navarro-Montes' attorney argued that a confession alone was insufficient to convict
21 Navarro-Montes of any crime. After the declaration, Navarro-Montes was taken to the Mexicali
22 state jail and booked on human trafficking charges. Munoz stated that Navarro-Montes never told
23 him he had been beaten or threatened in any way by Mexican authorities, and Navarro-Montes
24 appeared unharmed.

25 On cross examination, Munoz testified that he acted as a liaison regarding border crimes
26 between the Mexican federal prosecutor's office and the authorities in the United States. As such,
27 Munoz stated that he received regular communications from the United States. Munoz testified that
28 after Navarro-Montes' declaration, Munoz met with a United States special agent, and Munoz's boss

subsequently gave the agent permission to interview Navarro-Montes. Munoz also stated that prior to Navarro-Montes' declaration, Munoz, his boss, and a secretary were present for a pre-declaration interview with Navarro-Montes, during which he was not represented by an attorney, but spoke voluntarily when questioned.

        d)      <u>Jose Gustavo Onofre Pozos</u>

In February 2009, Jose Gustavo Onofre Pozos was a federal agent of investigations stationed in Mexico City. Pozos testified that his job duties included the apprehension of fugitives and in that capacity, he served as part of a team of Mexican federal agents who apprehended Navarro-Montes on February 11, 2009 in Pantla, Mexico. Pozos stated that the team of agents, assisted by local police, surrounded Navarro-Montes' location at 6:00 a.m. The agents were informed that Navarro-Montes might be armed. Based on a photograph of Navarro-Montes provided by the U.S. Federal Bureau of Investigation, Pozos recognized Navarro-Montes and he and the other agents took Navarro-Montes into custody.

Once the agents detained Navarro-Montes, he remained in the custody and presence of Pozos. Pozos testified that he rode in the back of the official vehicle with Navarro-Montes, and read the apprehension order to him as required. Navarro-Montes then proceeded to tell Pozos that he had run over the border patrol agent, but not intentionally. According to Pozos, Navarro-Montes was never beaten or otherwise physically abused, and exhibited a calm demeanor during transport.

On cross examination, Pozos testified that his commander advised him prior to the apprehension that Navarro-Montes was considered very dangerous. Pozos further stated that the apprehension order was for the Mexican drug trafficking charges, issued by a judge in Mexico, and that he was surprised when Navarro-Montes started to tell him about the death of the border patrol agent.

Pozos also testified that agents apprehended Navarro-Montes on the street, approximately 15 to 20 meters from a residence, in an alley. Navarro-Montes was alone, and agents never entered the residence.

        e)      <u>Jesus Albino Navarro-Montes</u>

Navarro-Montes testified that on January 22, 2008, agents arrested him in Pueblo Yaqui,

1  Mexico, placed him in the back of an unmarked vehicle, drove him to fields outside of the town, and
2  threatened him and hit him while telling him to take responsibility for the death of the border patrol
3  agent.  According to Navarro-Montes, the agents hit him in his side and his back after putting a trash
4  bag over his head.  The agents eventually transferred him to a patrol car and took him to the
5  prosecutor's office.  Navarro-Montes testified that he signed the statement after making his
6  declaration because the agents threatened him, saying that they knew where his family lived.  The
7  agents also told him that if he signed the statement they would not take him to the United States,
8  where he would get the death penalty.

9  Navarro-Montes testified that on the next day agents brought him in a patrol car to Mexicali.
10 Once he arrived, agents once again threatened his family, particularly his wife and child who live in
11 Mexicali, and therefore he signed another statement.  Navarro-Montes stated that he was released
12 from custody in June 2008.

13 Navarro-Montes stated that on February 11, 2009 he was asleep when agents arrested him in
14 his house, wearing only boxer shorts.  Navarro-Montes testified that Mexican agents threw him from
15 his bed to the ground, handcuffed him and took him out of the house.  Once they exited the house
16 into an alley, U.S. agents were waiting for him. According to Navarro-Montes, he made no
17 statement to any of the officers.

18 On cross examination, Navarro-Montes testified that upon his arrival on January 22, 2008 at
19 the prosecutor's office he informed his attorney and the prosecutor that he had been beaten prior to
20 his arrival.  He provided no information to agents and was forced to sign the written statements
21 because they threatened him with the death penalty in the U.S. and threatened his family.

22    *2. Relevant Law*

23 The Ninth Circuit has stated that "we assume without deciding that the constitutional
24 protection against involuntary confessions applies to confessions coerced by foreign police." *United*
25 *States v. Wolf*, 813 F.2d 970, 973 (9th Cir. 1987).  Thus, if a court finds that a defendant made an
26 inculpatory statement to foreign officials of his own free will, without duress or coercion, the
27 statement may be used against him in later proceedings.  Furthermore, the Ninth Circuit has held
28 that foreign officials interrogating foreign nationals do not have to give *Miranda* warnings prior to

obtaining voluntary confessions on foreign soil in order for such confessions to be admissible in a court in the United States, reasoning that the exclusionary rules have little if any deterrent effect on foreign police:

> *Miranda* was intended as a deterrent to unlawful police interrogations. When the interrogation is by the authorities of a foreign jurisdiction, the exclusionary rule has little or no effect upon the conduct of foreign police. Therefore, so long as the trustworthiness of the confession satisfies legal standards, the fact that the defendant was not given *Miranda* warnings before questioning by foreign police will not, by itself, render his confession inadmissible.

*United States v. Chavarria*, 443 F.2d 904, 905 (9th Cir. 1971).

Courts have found that two exceptions generally apply to the admissibility of voluntary statements made to foreign officials on foreign soil in the absence of *Miranda* warnings. *United States v. Yousef*, 327 F.3d 56, 145-46 (2d Cir. 2003).

First, if the United States engaged in a "joint venture" with the foreign officials, "statements elicited during overseas interrogation by foreign police in the absence of *Miranda* warnings must be suppressed." *Id.* at 145; *United States v. Heller*, 625 F.2d 594, 599 (5th Cir. 1980) ("if American officials participated in the foreign . . . interrogation, or if the foreign authorities were acting as agents for their American counterparts, the exclusionary rule should be invoked"); *United States v. Hensel*, 509 F. Supp. 1364, 1375 (D. Me. 1981). A joint venture occurs where the United States actively participated -- either directly or indirectly -- in the questioning of the defendant. Even if United States law enforcement did not directly question a defendant, courts suggest that a joint venture nonetheless exists if the American law enforcement agents used the foreign officials to carry out such questioning in order to circumvent *Miranda*'s mandates. *See Yousef*, 327 F.3d at 145-46; *United States. v. Abu Ali*, 395 F.Supp.2d 338, 381 (E.D. Va. 2005). With respect to extradition procedures, at least one circuit has held, in pertinent part:

> [E]vidence that the United States may have solicited the assistance of a foreign government in the arrest of a fugitive within its borders is insufficient as a matter of law to constitute United States participation under the joint venture doctrine . . . United States law enforcement officers are not required to "monitor the conduct" of foreign officials who execute a request for extradition or expulsion.

*Yousef*, 327 F.3d at 146 (quoting *United States v. Lira*, 515 F.2d 68, 71 (2d Cir. 1975)).

Second, even where a defendant voluntarily makes a statement, due process is violated where

"the foreign officers' conduct is so egregious that it 'shocks the conscience' of the American court." *United States v. Angulo-Hurtado*, 165 F.Supp.2d 1363, 1370 (N.D. Ga. 2001) (citing *United States v. Rosenthal*, 793 F.2d 1214, 1230-31 (11th Cir. 1986)); *see also Abu Ali*, 395 F.Supp.2d at 380. Any statements made as a result of such conduct are inadmissible in an American court. *United States v. Maturo*, 982 F.2d 57, 60-61 (2d Cir. 1992). Although not exhaustively defined, the types of circumstances that warrant the application of this exception generally involve the use of torturous interrogative methods. *See, e.g., United States v. Nagelberg*, 434 F.2d 585, 587 n. 1 (2d Cir. 1970). Navarro-Montes does not suggest that this exception pertains to the instant motion.

    *3.    Analysis*

The Court first must determine whether the government has proven by a preponderance of the evidence that Navarro-Montes voluntarily made the statements at issue. If the Court so finds, the statements will be admissible at trial unless the Court further concludes that the United States and Mexico were engaged in a joint venture, and Navarro-Montes was not informed of his rights under the U.S. constitution prior to making the statements.

    a)    <u>Voluntariness</u>

Navarro-Montes contends that his written and oral statements to Mexican authorities were the product of coercion and intimidation stemming from threats and physical abuse by the officers responsible for his detention. When "a confession challenged as involuntary is sought to be used against a criminal defendant at his trial . . . the prosecution must prove by at least a preponderance of the evidence that the confession was voluntary." *Lego v. Twomey*, 404 U.S. 477, 489 (1972)*; see also Colorado v. Connelly*, 479 U.S. 157, 168 (1986) (reaffirming *Lego*). To meet its burden, the government must demonstrate that such a statement was "the product of an essentially free and unconstrained choice." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (internal quotation marks omitted). If a defendant's "will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Id.* at 225-26.

The Court finds that the government has satisfied its burden of proving by a preponderance of the evidence that Navarro-Montes did not make the January 22, 2008, January 23, 2008, and February 11, 2009 statements as a result of coercion or undue influence. The testimony of the

1  government's witnesses at the evidentiary hearing uniformly corroborate that Navarro-Montes
2  suffered no coercive physical or psychological abuse while detained in January 2008 or February
3  2009, and was at no time, including during the custodial interviews on each occasion, threatened or
4  mistreated in any way.  The witnesses provided consistent accounts of Navarro-Montes' demeanor
5  during questioning, stating that he never mentioned any abuse and was calm.  None of the witnesses
6  recalled observing any physical signs of abuse.  Navarro-Montes' public defender testified that if he
7  had been told of or observed any such abuse he would have made a statement to that effect at the
8  close of his client's ministerial declaration, thus memorializing it in writing.  The integrity of these
9  procedures and the adequacy of the public defender's representation of Navarro-Montes were not
10 brought into question.

11    The other evidence also supports the credible testimony of the government's witnesses.
12 Forensic medical doctors assigned to the State Attorney General's Office examined Navarro-Montes
13 on the evening of January 22, 2008, and found him to be in good physical health with no evident
14 external injuries, ambulatory, with a normal gait.  *See Gov't. Ex. 2 & 2A*.  Photographs of Navarro-
15 Montes taken on February 11, 2009 immediately subsequent to his apprehension by Mexican agents
16 reveal no external injuries on his face or upper torso.  *See Gov't. Ex. 8*.  The federal public defender
17 assigned to represent Navarro-Montes on January 23, 2008 submitted a sworn affidavit on behalf of
18 his client, arguing for his immediate release.  *See Gov't. Ex. 5 & 5A*.  In the affidavit, Navarro-
19 Montes' attorney presented legal arguments to support the minimization of the evidentiary value of
20 his client's inculpatory statements to authorities, but included no facts to suggest that those
21 statements were the product of coercion or duress.

22    The only evidence before the Court of any abuse or threats to Navarro-Montes is his own
23 self-serving declaration submitted in support of his motion, and his testimony during the evidentiary
24 hearing.  The Court acknowledges that Navarro-Montes' version of events remained consistent, even
25 upon cross examination.  However, the clear and direct conflict between the testimony of the
26 Mexican authorities and that of Navarro-Montes requires the Court to make a credibility
27 determination.  The weight of the evidence belies Navarro-Montes' allegations of threats and abuse,
28 which the Court found to be less credible than the corroborating testimony of the other witnesses

1 and documentary evidence. Navarro-Montes has a clear interest in the outcome of the hearing and,
2 thus, had a motivation to slant his testimony so as to make it appear that his statements were not
3 voluntary.

4       The Court concludes that Navarro-Montes' statements were the "product of an essentially
5 free and unconstrained choice" and shall not be suppressed on grounds of involuntariness.
6 *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973).

7       b)     Joint Venture

8       Navarro-Montes argues that the statements in question should be suppressed on the
9 alternative ground that Mexican authorities were required to provide *Miranda* warnings under the
10 "joint venture" doctrine, but failed to do so. While there was ongoing cooperation in this case
11 between U.S. and Mexican authorities, it is not sufficient to be considered a "joint venture."

12       First, the exchange of information between law enforcement agencies in the United States
13 and Mexico is standard operating procedure on both sides of the border. Neither the existence of an
14 extradition request, the fact that the F.B.I. provided Mexican agents with Navarro-Montes' location
15 prior to apprehension, nor the involvement of an agent acting in the specific capacity as a liaison
16 with U.S. investigators, supports his asserted entitlement to *Miranda* protection. Navarro-Montes
17 ran afoul of Mexican state laws by attempting to bribe police, and was subject to detention pursuant
18 to a warrant issued by a judge in Mexico for violation of Mexican federal laws, thus the United
19 States and Mexico had separate and independent interests in detaining and questioning him.
20 Ordinary requests for extradition are alone insufficient evidence of a joint venture, *Yousef, supra*,
21 327 F.3d at 146, but particularly in a case such as this where the foreign national is the target of an
22 active investigation by authorities in his country of origin for violating the laws of that country. The
23 Information provided by Sonoran police and the federal arrest warrant issued by a judge in Mexico,
24 belie Navarro-Montes' claim that he was apprehended and questioned only because he was
25 suspected of committing a crime in the United States.

26       Furthermore, the evidence supports the government's assertion that U.S. officials were not
27 present when Navarro-Montes made statements to Mexican authorities on January 22 and 23, 2008,
28 and Mexican authorities did not act on behalf of U.S. agents when questioning him. "In the absence

of active participation by a United States official in the evidence-gathering event, a joint venture can only exist when foreign officials are rendered 'agents' of the United States government, or when the cooperation was designed to evade the constitutional requirements applicable to American investigators." *United States v. Karake*, 443 F. Supp. 2d 8, 94 (D.D.C. 2006) (citations omitted). Whatever information sharing or cooperation might have occurred, there is nothing in the record to support a finding that the Mexican police and prosecutor's office were rendered "agents" of the U.S. authorities, even under a broad view of the "joint venture" standard. Nor does the evidence suggest that U.S. authorities orchestrated Navarro-Montes' ministerial declarations with Mexican authorities to avoid advising him of his rights. *Miranda* warnings were not required prior to questioning by Mexican authorities subsequent to an arrest by Mexican police for allegedly violating Mexican law. This conclusion notwithstanding, the Court notes that prior to each declaration Mexican officials advised Navarro-Montes of his rights under Mexican law, giving him substantially similar admonitions as one receives when read their rights under the U.S. Constitution. Navarro-Montes was informed that he had the right to an "adequate defense, either representing himself or through an attorney," and that if he could not afford an attorney, one would be appointed to represent him. *See Gov't. Ex..3 & 3A*. He was advised of the charges against him and told he did not have to make a statement and could "remain silent if he so wishes." *See Gov't. Ex. 4 & 4A*. Navarro-Montes voluntarily waived those rights prior to each declaration.

With respect to the statement made on February 11, 2009, U.S. officials did not direct or control the Mexican sting operation, which was carried out by Mexican federal agents. Participation by U.S. agents in the operation is insufficient to establish a joint venture. *Pfeifer v. United States Bureau of Prisons*, 615 F.2d 873, 877 (9th Cir. 1980) (finding no joint venture where an armed U.S. agent was present in the room during defendant's interrogation by Mexican officials). And by all accounts, the statement Navarro-Montes seeks to suppress was not made in response to any purported questioning or its functional equivalent by authorities from either country, but rather was spontaneously uttered during his apprehension by Agent Pozos.

"To decide whether a joint venture has occurred, the court must closely 'scrutinize the attendant facts.'" *United States v. Rose*, 570 F.2d 1358, 1362 (9th Cir. 1978) (citing *Byars v. United*

1 | *States*, 273 U.S. 28, 32 (1927)).  Based upon the record, the Court concludes that Navarro-Montes'
2 | statements were not the product of a joint venture.

### CONCLUSION

For the foregoing reasons, Defendant Jesus Albino Navarro-Montes' motion to suppress is **DENIED** as to the statements discussed herein.

**IT IS SO ORDERED**.

DATED:  January 27, 2011

*[signature]*

Hon. Michael M. Anello
United States District Judge